# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 20, 2018        Decided July 20, 2018

No. 17-1059

OGLALA SIOUX TRIBE,
PETITIONER

v.

U.S. NUCLEAR REGULATORY COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

POWERTECH (USA), INC.,
INTERVENOR

On Petition for Review of an Order of the
United States Nuclear Regulatory Commission

*Jeffrey C. Parsons* argued the cause for petitioner. With him on the briefs was *Travis Stills*. *Roger Flynn* entered an appearance.

*James E. Adler*, Senior Attorney, U.S. Nuclear Regulatory Commission, argued the cause for respondents. With him on the brief were *Jeffrey H. Wood*, Acting Assistant Attorney General, U.S. Department of Justice, *Eric Grant*, Deputy Assistant Attorney General, *Lane N. McFadden*, Attorney, and *Andrew P. Averbach*, Solicitor, U.S. Nuclear Regulatory Commission.

*Christopher S. Pugsley* argued the cause for intervenor-respondent. With him on the brief was *Anthony J. Thompson*.

Before: GARLAND, *Chief Judge*, and HENDERSON and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*: Powertech (USA), Inc. applied to the Nuclear Regulatory Commission for a license to construct a uranium mining project in the Black Hills of South Dakota. The Oglala Sioux Tribe, which has historical ties to the proposed project area, intervened in opposition because it feared the destruction of its cultural, historical, and religious sites. The staff of the Commission granted the license.

On administrative appeal, the Commission decided to leave the license in effect -- notwithstanding its own determination that there was a significant deficiency in its compliance with the National Environmental Policy Act -- pending further agency proceedings to remedy the deficiency. The Commission grounded this decision on the Tribe's inability to show that noncompliance with the Act would cause irreparable harm. In so doing, the Commission was following what appears to be the agency's settled practice to require such a showing.

The National Environmental Policy Act, however, obligates every federal agency to prepare an adequate environmental impact statement *before* taking any major action, which includes issuing a uranium mining license. The statute does not permit an agency to act first and comply later. Nor does it permit an agency to condition performance of its obligation on a showing of irreparable harm. There is no such exception in the statute.

3

In fact, such a policy puts the Tribe in a classic Catch-22. In order to require the agency to complete an adequate survey of the project site before granting a license, the Tribe must show that construction at the site would cause irreparable harm to cultural or historical resources. But without an adequate survey of the cultural and historical resources at the site, such a showing may well be impossible. Of course, if the project does go forward and such resources are damaged, the Tribe will then be able to show irreparable harm. By then, however, it will be too late.

The Commission's decision to let the mining project proceed violates the National Environmental Policy Act. Indeed, it vitiates the requirements of the Act. We therefore find the decision contrary to law and grant the petition for review in part. The Tribe also challenges other aspects of the Commission's order but, as we explain, we lack jurisdiction to consider those rulings.

I

The Atomic Energy Act, 42 U.S.C. § 2011 *et seq.*, authorizes the Nuclear Regulatory Commission (NRC) to issue licenses to qualified applicants to transfer, deliver, or receive source material from *in-situ* leach uranium mining (also known as ISL or ISR mining), a process used to recover underground uranium for subsequent use in nuclear power plants. 42 U.S.C. § 2092; *see Va. Uranium, Inc. v. Warren*, 848 F.3d 590, 596 (4th Cir. 2017). No one can conduct such activities without an NRC license. 42 U.S.C. § 2092. The Act also creates hearing rights. Anyone "whose interest may be affected by [a] proceeding" to grant a license has the right to intervene and present "contentions" challenging the license. *Id.* § 2239(a)(1)(A); 10 C.F.R. § 2.309(a), (f).

The licensing process involves three relevant components of the NRC.

The first is the Commission Staff, which is responsible for reviewing a license application, analyzing the environmental effects and other features of the proposed project, and issuing an initial decision approving or denying the application. 10 C.F.R. §§ 2.103, 51.80, 51.102.

The second is an Atomic Safety and Licensing Board (ASLB), a panel that can be designated to preside over a licensing hearing, at which the Board hears contentions from intervenors and then issues an initial decision on those contentions. *Id.* §§ 2.313(a), 2.321, 2.1210. Through the Board hearing process, intervenors can challenge the agency's compliance with the National Environmental Policy Act (NEPA), which requires federal agencies to prepare a detailed Environmental Impact Statement (EIS) for any "proposed" major federal action that "significantly affect[s] the quality of the human environment," 42 U.S.C. § 4332(2)(C), including granting the kind of license at issue here, *see* 10 C.F.R. § 51.20(b)(8).

Third is the Commission itself. Once the Board issues an initial decision on the contentions before it, parties can seek review from the Commission. *Id.* § 2.341(b). The Commission "may adopt, modify, or set aside" the Board's decision. *Id.* § 2.344(b).

In 2009, Powertech applied for an NRC license authorizing it to "construct and operate" a uranium mining project, called the "Dewey-Burdock project," in the southwest corner of South Dakota. NRC, Record of Decision for the Dewey-Burdock Uranium In-Situ Recovery Project at 1 (2014) ("Record of

Decision") (J.A. 738). The NRC described the project as follows:

> The proposed facility will encompass approximately . . . 10,580 acres[,] which consists of two contiguous mining units . . . . Powertech intends to recover uranium and produce yellowcake at the Dewey-Burdock site. Powertech's proposed activities include construction, operation, aquifer restoration, and decommissioning of its ISR facility. In addition, Powertech has proposed that liquid wastewater generated during uranium recovery be disposed of through one of the following methods: (i) deep well disposal via Class V injection wells, (ii) land application, or (iii) a combination of deep well disposal and land application.

*Id.* at 1-2 (J.A. 738-39).[1] The NRC's chief administrative judge established an Atomic Safety and Licensing Board to preside over Powertech's licensing proceeding.

---

[1] The NRC further explained the ISR process as follows:

> [A]n oxidant-charged solution, called a lixiviant, will be injected into the production zone aquifer (uranium orebody) through injection wells. . . . As the lixiviant circulates through the production zone, it will oxidize and dissolve the mineralized uranium . . . . The resulting uranium-rich solution will be drawn to recovery wells by pumping and then transferred to a processing facility via a network of underground pipelines. At the processing facility, the uranium will be removed from solution via ion exchange.

Record of Decision at 2 (J.A. 739).

The petitioner here, the Oglala Sioux Tribe, intervened to challenge Powertech's application. The Tribe's Pine Ridge Reservation is located roughly fifty miles from the project site, Powertech USA, Inc., 81 N.R.C. 618, 656 (2015) ("ASLB Initial Decision") (J.A. 455), and the project lands are within the Tribe's traditional territory, *see* Trina Lone Hill Decl. ¶ 5. A sizable number of cultural, historical, and archaeological sites have already been identified in the project area, including burial sites. EIS for Dewey-Burdock Project, NUREG-1910 at 4-159 to -182 (Jan. 2014) ("EIS") (J.A. 655-78). The Tribe also owns lands near the proposed project, which it has "leased for domestic, agricultural, water development, conservation, and other purposes." Oglala Br. 4. The Tribe's primary concerns regarding the project are protecting the Tribe's cultural and historical resources, as well as protecting groundwater from mining contamination. *Id.*

While the Board set the stage for the Powertech hearing, the Commission Staff drew up environmental documents for the Dewey-Burdock project, including an EIS, which it published in 2014. *See* EIS, NUREG-1910 (J.A. 567-737).[2] After publishing the EIS, the Staff granted Powertech's application and issued the requested license. Record of Decision at 1 (J.A. 738).

The Tribe promptly moved to stay the license. Without assessing the merits of the Tribe's contentions, the Board denied

---

[2] Technically, this was the Final Supplemental Environmental Impact Statement (FSEIS) for the project. The Staff first published a draft supplemental EIS, which built on the Commission's generic EIS for *in-situ* leach uranium mining facilities. In 2014, it issued the FSEIS, which is the document most relevant to this case. The NRC brief occasionally refers to the document as the "EIS." *See, e.g.*, NRC Br. 49-52. For purposes of clarity, we will do so consistently throughout this opinion.

the stay. It did so on the ground, inter alia, that the Tribe's allegations "lack[ed] the specificity needed to demonstrate a serious, immediate, and irreparable harm to cultural and historic resources." Order, Powertech USA, Inc., No. 40-9075-MLA at 6 (May 20, 2014) ("ASLB Stay Denial Order") (J.A. 516).

After denying the stay, the Board held a hearing on the merits of the contentions pending before it. The Board ruled against the Tribe, and in favor of the Staff and Powertech, on the bulk of those contentions.[3] However, on two of the Tribe's contentions, Contentions 1A and 1B, the Board ruled in favor of the Tribe. ASLB Initial Decision, 81 N.R.C. at 708-10 (J.A. 507-09).

In Contention 1A, which is most significant for our purposes, the Tribe charged that the EIS did not satisfy NEPA because it failed to adequately address the environmental effects of the Dewey-Burdock project on Native American cultural, religious, and historical resources. The Board agreed with this charge, finding that:

> [T]he [EIS] in this proceeding does not contain an analysis of the impacts of the project on the cultural, historical, and religious sites of the Oglala Sioux Tribe

---

[3] As relevant to the Tribe's petition in this court, the Board ruled against the Tribe on: Contention 2, regarding the sufficiency of baseline groundwater quality information; Contention 3, concerning the EIS's analysis of features that could permit groundwater migration; and Contention 6, relating to the EIS's analysis of proposed mitigation measures. ASLB Initial Decision, 81 N.R.C. at 708-09 (J.A. 507-08). The ASLB had previously found against the Tribe on Contention 7, with respect to the adequacy of a plan for disposing of byproduct material; and Contention 8, regarding the scoping process. See Powertech (USA), Inc., 84 N.R.C. 219, 226 (2016) (J.A. 243).

and the majority of the other consulting Native American tribes. . . . Because the cultural, historical, and religious sites of the Oglala Sioux Tribe have not been adequately catalogued, the [EIS] does not include mitigation measures sufficient to protect this Native American tribe's cultural, historical, and religious sites that may be affected by the Powertech project.

Accordingly, as to Contention 1A, the Board finds and concludes that the [EIS] has not adequately addressed the environmental effects of the Dewey-Burdock project on Native American cultural, religious, and historic resources. . . . NEPA's hard look requirement has not been satisfied.

*Id.* at 655 (citations omitted) (J.A. 454).

In Contention 1B, the Tribe charged that the NRC Staff had failed to fulfill its responsibilities regarding consultation with Native American tribes under the National Historic Preservation Act (NHPA), 54 U.S.C. § 306108. For a variety of reasons, the Board agreed that the consultation process between the NRC Staff and the Tribe was inadequate to satisfy the statute. ASLB Initial Decision, 81 N.R.C. at 655-57 (J.A. 454-56).

Despite what the Board concluded was a "significant deficiency in the NRC Staff's NEPA review," it did not suspend Powertech's previously issued license. *Id.* at 658 (J.A. 457). Instead, it retained jurisdiction and directed the Staff to cure "the deficiencies in Contentions 1A and 1B." *Id.* In the interim, it said, the Tribe "may . . . petition this Board for a stay of the license's effectiveness, as may be necessary to halt ground disturbing activities," but only "if the . . . Tribe can identify specific cultural, historic, or religious sites that are subject to immediate and irreparable harm by the Powertech project." *Id.*

The action then moved to the Commission.  The Tribe, the Staff, and Powertech all petitioned the Commission for review of the Board's decision.  The Staff and Powertech challenged the Board's partial resolution of Contentions 1A and 1B in favor of the Tribe.  With respect to those same contentions, the Tribe argued that NEPA and the National Historic Preservation Act "prohibit[ed] the Board from leaving [Powertech's] license in place," given the project's inadequate environmental review. Powertech (USA), Inc., 84 N.R.C. 219, 245 (2016) ("NRC Order") (J.A. 268).  The Tribe also challenged the Board's rejection of its other contentions.  *Id.* at 224-26 (J.A. 240-43).

The Commission generally upheld the Board's rulings.  *Id.* It left in place the findings that the Staff had failed to comply with NEPA and the National Historic Preservation Act.  *See id.* at 248 (J.A. 272).  Nonetheless, it affirmed the Board's decision to leave the license in effect because the Tribe "has not articulated any harm or prejudice" from the Staff's failure.  *Id.* at 245 (J.A. 268).  The Commission then directed that the proceeding "remain open for the narrow purpose of resolving the deficiencies identified by the Board." *Id.* at 262 (J.A. 292). And it denied the Tribe's other challenges.  *Id.* at 229, 237, 253, 256, 262 (J.A. 246, 258, 279-80, 283, 291-92).

Commissioner Baran dissented on the point that is now at issue before us:  the Commission's decision to leave Powertech's license in effect while the Staff attempted to resolve the deficiencies in its NEPA review.  His dissent stated as follows:

> [A] core requirement of NEPA is that an agency decisionmaker must consider an adequate environmental review *before* making a decision on a licensing action.  If the Commission allows a Board to supplement and cure an inadequate NEPA document

*after* the agency has already made a licensing decision, then this fundamental purpose of NEPA is frustrated.

In this case, the Board found that the Staff's [EIS] did not meet the requirements of NEPA because the [EIS] was deficient with respect to the effects of the licensing action on Native American cultural, religious, and historic resources. Thus, the agency did not have an adequate environmental analysis at the time it decided whether to issue the license. In fact, the deficiencies in the NEPA analysis remain unaddressed today, and therefore the Staff still cannot make an adequately informed decision on whether to issue the license. The Staff's licensing decision was based on (and continues to rest on) an inadequate environmental review. As a result, the Staff has not complied with NEPA.

The Commission should suspend the license until the Staff has . . . demonstrat[ed] that the [EIS] complies with NEPA . . . .

*Id.* at 269 (Commissioner Baran, dissenting in part) (citations omitted) (J.A. 301-02).

Thereafter, the Tribe filed a petition in this court for review of the Commission's order. Its principal challenge is to the NRC's decision to leave the license in effect pending the Staff's effort to cure the NEPA deficiencies. The Tribe also challenges the disposition of its other contentions, which are set out in footnote 3, *supra*.

11

II

We begin with our jurisdiction.

A

Under the Hobbs Act, this court has jurisdiction to review "final orders" of the Commission.  28 U.S.C. § 2342(4).  Generally, a final order is "one that disposes of all issues as to all parties."  *Blue Ridge Envtl. Def. League v. NRC*, 668 F.3d 747, 753 (D.C. Cir. 2012) (internal quotation marks omitted); *see CSX Transp., Inc. v. Surface Transp. Bd.*, 774 F.3d 25, 28 (D.C. Cir. 2014).  Typically, an order "remanding a matter to an [administrative law judge, or here, to the ASLB] will not, on its own, satisfy the principle of finality."  *Meredith v. Fed. Mine Safety & Health Review Comm'n*, 177 F.3d 1042, 1050 (D.C. Cir. 1999).

Applying this standard, we conclude that the Commission's order, as a whole, is not final.  It did not consummate the agency's decisionmaking process as to all issues, but instead left the proceeding "open" while the Staff attempted to resolve the deficiencies in NEPA compliance (Contention 1A) and in the National Historic Preservation Act consultation process (Contention 1B).  NRC Order, 84 N.R.C. at 262 (J.A. 292).

In keeping with this instruction, the Atomic Safety and Licensing Board has continued to oversee the Staff's efforts to cure the statutory deficiencies.  In October 2017, the Board granted the Staff's motion for summary disposition regarding Contention 1B, concluding that the Staff's consultation efforts over the intervening two years had satisfied the National Historic Preservation Act.  Powertech USA, Inc., 86 N.R.C. 167, 173 (2017) ("ASLB Summary Disposition Order").  But the Board denied the Staff's motion to dismiss the Tribe's NEPA

contention (Contention 1A), and the adjudication of that contention remains pending. *Id*. at 173-74. The Board order set a schedule contemplating resolution of the outstanding NEPA contention on or before October 12, 2018, *id.* at 210, but the Board has since suspended that schedule without imposing a new end date, *see* Order Suspending Scheduled Dates, Powertech USA, Inc., No. 40-9075-MLA at 2-3 (Apr. 12, 2018).

Because the Commission's order did not end the agency proceeding as to all issues, we do not have jurisdiction to review the bulk of the rulings challenged by the Tribe.

B

We do have jurisdiction, however, to review one of the rulings contained in the NRC order: the decision to leave the license in effect -- notwithstanding the NRC's determination that the agency is not in compliance with NEPA -- pending further proceedings before the Atomic Safety and Licensing Board.[4] That ruling falls within the collateral order doctrine.[5]

---

[4] Although the collateral order doctrine might also have given us jurisdiction over the NRC's parallel ruling regarding compliance with the National Historic Preservation Act, the ASLB's subsequent determination that the Staff's consultation efforts satisfied that Act, ASLB Summary Disposition Order, 86 N.R.C. at 173, means that the agency is no longer going forward despite an acknowledged NHPA violation. Thus, the analysis set forth below, which brings the NEPA contention within the doctrine, applies only to that contention.

[5] Because we find that the ruling is reviewable as a collateral order, we do not decide whether review of the ruling would also fall within the scope of this circuit's "immediate effectiveness" doctrine. *See Blue Ridge Envtl. Def. League*, 668 F.3d at 757; *Massachusetts v. NRC*, 924 F.2d 311, 322 (D.C. Cir. 1991).

Pursuant to 28 U.S.C. § 1291, courts of appeals "have jurisdiction of appeals from all final decisions of the district courts of the United States." The Supreme Court, however, "has long given § 1291 a practical rather than a technical construction[,] . . . encompass[ing] not only judgments that terminate an action, but also a small class of collateral rulings that, although they do not end the litigation, are appropriately deemed 'final.'" *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (internal quotation marks omitted). Because the finality requirement of the Hobbs Act "is the counterpart to that of 28 U.S.C. § 1291," we have permitted appeals from the same small category of interlocutory rulings made by administrative agencies. *Cmty. Broad. of Boston, Inc. v. FCC*, 546 F.2d 1022, 1024 (D.C. Cir. 1976) (construing the Hobbs Act); *see CalPortland Co. v. Fed. Mine Safety & Health Review Comm'n*, 839 F.3d 1153, 1159-60 (D.C. Cir. 2016) (construing the Mine Act); *Meredith*, 177 F.3d at 1050-51 (same). In applying the collateral order doctrine, we remain mindful of the Supreme Court's admonition that "it must never be allowed to swallow the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered." *Mohawk Indus*., 558 U.S. at 106 (internal quotation marks omitted).

To effectuate that admonition, the Court has limited appealable collateral rulings to a "small category [that] includes only decisions [1] that are conclusive, [2] that resolve important questions separate from the merits, and [3] that are effectively unreviewable on appeal from the final judgment in the underlying action." *Id.* (quoting *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 42 (1995)). Applying these conditions, we conclude that the ruling before us, which expressly permits a license to go forward despite the agency's acknowledgment

14

that it has not complied with NEPA, is a reviewable collateral order.

First, that ruling is "a fully consummated decision . . . that conclusively and finally determine[s]" the effectiveness of Powertech's license for the foreseeable future. *See CalPortland Co.*, 839 F.3d at 1160 (internal quotation marks omitted). More important, it conclusively determines the Commission's interpretation of what NEPA requires in this circumstance. The Commission has decided that a license can remain effective and that construction can go forward -- despite the agency's failure to satisfy the requirements of NEPA -- unless the Tribe can show irreparable harm from leaving the license in place while the NEPA violation is cured. There is "no basis to suppose that the [Commission] contemplate[s] any reconsideration of [the] decision," *id.* (internal quotation marks omitted), to permit such a license to remain effective unless irreparable harm can be shown. *See* NRC Br. 33 (stating that the Tribe can seek a stay only if a "*new* development [arises] that could potentially support an irreparable harm demonstration"). To the contrary, the "irreparable harm" standard appears to be the agency's settled practice. *See infra* Part III.A.

Second, the order resolves an "important question[] separate from the merits," *Mohawk Indus.*, 558 U.S. at 106 (quoting *Swint*, 514 U.S. at 42). Powertech now has the right to an effective license, despite an ongoing NEPA violation that the agency acknowledges. The Commission's irreparable harm standard for vacating the license pending the conclusion of its administrative adjudication has no bearing on its ultimate resolution of the merits of the Tribe's multiple contentions, including whether NEPA actually has been (or subsequently will be) satisfied. And the Commission's resolution of the merits of those questions will not address the validity of that standard.

Third, the ruling that permits projects to go forward despite "significant" NEPA violations will be effectively unreviewable if the Tribe is forced to wait for the conclusion of the agency's adjudication before appealing. If we do not hear that issue now, the ASLB proceedings will continue. At the end of that process, the agency either will conclude that the Staff has been unable to satisfy NEPA and will therefore (presumably) vacate the license, *see* NRC Br. 8, 30, or it will determine that the Staff has finally satisfied NEPA and reaffirm the license. If it reaches the former conclusion, there will be nothing left for the Tribe to petition to review. If it reaches the latter, our precedent will require denial of the petition on the ground that -- at that point -- a remand would be futile. *See Friends of the River v. FERC*, 720 F.2d 93, 106-08 (D.C. Cir. 1983) (denying as futile a petition for review when the agency issued a license despite noncompliance with NEPA, but subsequently complied before the petition for review was filed); *see also Nat. Res. Def. Council v. NRC*, 879 F.3d 1202, 1211-12 (D.C. Cir. 2018) (same, citing *Friends of the River*, 720 F.2d 93).

In evaluating this third condition, the Supreme Court has said that "the decisive consideration is whether delaying review until the entry of final judgment would imperil a substantial public interest or some particular value of a high order." *Mohawk Indus.*, 558 U.S. at 107 (internal quotation marks omitted). We know that the environmental values protected by NEPA are of a high order -- because Congress has told us so.[6] We likewise know (as discussed in Part III.A below) that Congress has directed that, to protect those values, "all agencies

---

[6] *See* 42 U.S.C. § 4331 (recognizing "the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man," and declaring the federal government's responsibility to "preserve important historic, cultural, and natural aspects of our national heritage").

of the Federal Government" must prepare an environmental impact statement that satisfies NEPA *before* taking an action like granting Powertech's license. 42 U.S.C. § 4332(2)(C); *see* 10 C.F.R. § 51.20(b)(8). Delaying review of an action that concededly was not preceded by a valid EIS would imperil the public interest in requiring that a valid EIS be prepared before the agency grants the license. Moreover, if review is delayed until final judgment, and vulnerable but as-yet-unidentified historical, cultural, or religious sites are damaged in the interim, the court will be unable to remedy that injury to the public interest -- an interest that NEPA's procedural mandate was intended to vindicate. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-51 (1989).

Finally, in making the collateral order determination, the Court has instructed that we "not engage in an individualized jurisdictional inquiry," but rather focus on "the entire category to which a claim belongs." *Mohawk Indus.*, 558 U.S. at 107 (internal quotation marks omitted). "[T]he chance that the litigation at hand might be speeded, or a particular injustic[e] averted, does not provide a basis for . . . jurisdiction." *Id.* (internal quotation marks omitted). Our conclusion in this case is in accord with that direction as well. Here, we focus not only on the Tribe's challenge to the effectiveness of Powertech's license, but rather on the entire category of claims that challenge (and will challenge) NRC's legal position that it may leave a license in full effect despite the agency's failure to comply with NEPA.

We therefore have jurisdiction to consider whether the NRC may authorize a licensee to go ahead with construction -- notwithstanding the Commission's conclusion that there has

been a significant deficiency in its NEPA compliance -- unless an intervenor demonstrates irreparable harm.[7]

## III

Our review of this matter is governed by the Administrative Procedure Act (APA), 5 U.S.C. § 706(2). *See Blue Ridge Envtl. Def. League v. NRC*, 716 F.3d 183, 195 (D.C. Cir. 2013). Under the APA, we must hold an agency's action unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## A

NEPA requires that "all agencies of the Federal Government shall . . . include in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official" on:

> (i)   the environmental impact of the proposed action,

---

[7] We are unpersuaded by NRC counsel's suggestion that the Tribe should have raised this challenge when the Staff first made Powertech's license effective in 2014. NRC Br. 33. The Tribe did apply for a stay at that time, and it did not appeal after the ASLB denied its application. But the question posed at that moment was not the same as the one raised here. When the Tribe first sought a stay, neither the Commission nor the Board had yet acknowledged the NEPA violation and neither had ruled that the license could remain in effect notwithstanding the violation. *See* ASLB Stay Denial Order, No. 40-9075-MLA at 8-9 (J.A. 518-19). Hence, the Tribe could not have challenged the ruling and policy that it alleges here is unlawful: letting a project go forward despite the Commission's acknowledgment that it has not satisfied NEPA's requirements.

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C); *see New York v. NRC*, 681 F.3d 471, 476 (D.C. Cir. 2012). There is no dispute that the NRC's grant of a uranium mining license constitutes such a "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see* NRC Br. 5 ("NRC regulations . . . require NRC to prepare an EIS prior to issuing an *in situ* recovery facility license."); ASLB Initial Decision, 81 N.R.C. at 641 n.123 (J.A. 440) ("Issuing a license to possess and use source material to a uranium milling facility is identified as a major federal action."); 10 C.F.R. § 51.20(b)(8).

This statutory provision requires agencies to take a "hard look" at environmental consequences before undertaking any such action. *Robertson*, 490 U.S. at 350. The environmental effects that must be assessed include "aesthetic, historic, cultural, economic, social, or health" effects. 40 C.F.R. § 1508.8(b); *see* 42 U.S.C. § 4331(b)(4) (declaring that "preserv[ing] important historic, cultural, and natural aspects of our national heritage" is an element of national environmental policy). And the Commission's regulations expressly require its Staff to include, in an environmental impact statement, "an

analysis of significant problems and objections raised by . . . any affected Indian Tribes." 10 C.F.R. § 51.71(b).

The Atomic Safety and Licensing Board ruled that, to "fulfill the agency's NEPA . . . responsibilities to protect and preserve cultural, religious, and historical sites important to the Native American tribal cultures in the Powertech project area, the NRC Staff must conduct a study or survey of tribal cultural resources before granting a license." ASLB Initial Decision, 81 N.R.C. at 653 (J.A. 452). As discussed in Part I above, the Board found that "the [EIS] in this proceeding does not contain" such an analysis. *Id.* at 655 (J.A. 454). Moreover, "[b]ecause the cultural, historical, and religious sites of the Oglala Sioux Tribe have not been adequately catalogued, the [EIS] does not include mitigation measures sufficient to protect this Native American tribe's cultural, historical, and religious sites that may be affected by the Powertech project." *Id.* "Accordingly," the Board concluded, "NEPA's hard look requirement has not been satisfied." *Id.*

The Board did not find just a technical violation of NEPA. Rather, it found that "the inadequate discussion of potential impacts to Sioux cultural, historical, or religious sites in the [EIS] or Record of Decision is a *significant deficiency* in the NRC Staff's NEPA review." *Id.* at 658 (emphasis added) (J.A. 457). And the Commission did not disagree. Refusing to "second guess the Board's fact-finding," the Commission declined to set aside the Board's order and denied the Staff's petition for review with respect to the Tribe's NEPA contention. NRC Order, 84 N.R.C. at 248 (J.A. 272-73).

For purposes of our review, we accept the Board's finding -- undisturbed by the Commission -- that the agency did not fulfill its NEPA responsibilities. We do not review the merits of that conclusion.

Notwithstanding the Board's finding, and in particular its acknowledgment that the Staff "must conduct a study or survey of tribal cultural resources *before* granting a license" in order to fulfill the agency's NEPA responsibilities, ASLB Initial Decision, 81 N.R.C. at 653 (emphasis added) (J.A. 452), the Board ruled that it would not suspend Powertech's license unless the Tribe sought a stay within ten days and showed that "specific cultural, historic, or religious sites . . . are subject to immediate and irreparable harm." *Id.* at 658 (J.A. 457). The Commission likewise refused to vacate the license on the ground that more than just a NEPA violation was required, stating that there was no need to disturb the license because the "Tribe ha[d] not articulated any harm or prejudice." NRC Order, 84 N.R.C. at 245 (J.A. 268).

The agency thus conditioned enforcement of NEPA on a showing of irreparable harm by the Tribe.[8] It did so even though, as Commissioner Baran explained in dissent, the agency lacked an adequate environmental analysis when it first issued the license and the significant NEPA deficiencies identified by the Board "remain[ed] unaddressed" at the time of the

---

[8] Although the Commission's order vaguely referred to "harm or prejudice," NRC Order, 84 N.R.C. at 245 (J.A. 268), it upheld the Board's order requiring a showing of "irreparable harm," ASLB Initial Decision, 81 N.R.C. at 658 (J.A. 457). The NRC also noted that the Tribe "did not request a stay of the effectiveness of the license," NRC Order, 84 N.R.C. at 245 (J.A. 268), which the Board had made clear it would not grant unless the Tribe could identify specific "sites that are subject to immediate and irreparable harm by the Powertech project," ASLB Initial Decision, 81 N.R.C. at 658 (J.A. 457). And the NRC brief likewise indicates that "irreparable harm" is the Commission's own standard. *See* NRC Br. 1 (emphasizing that "the Tribe demonstrated no irreparable harm"); *id.* at 33 (noting that the Tribe could still seek a stay if "a *new* development" could support "an irreparable harm demonstration").

Commission's decision. *Id.* at 269 (Commissioner Baran, dissenting in part) (J.A. 301). Therefore "[t]he Staff's licensing decision was based on (and continues to rest on) an inadequate environmental review." *Id.*

Moreover, this was not a one-off decision by the NRC. Rather, it appears to reflect the agency's settled practice. *See* Strata Energy, Inc., 83 N.R.C. 566, 595 n.188 (2016) ("It is well settled that parties challenging an agency's NEPA process are not entitled to relief unless they demonstrate harm or prejudice."); *see also* Crow Butte Resources, Inc., 83 N.R.C. 340, 413-14 (2016) (relying on the *Powertech* precedent to keep a license in effect, notwithstanding finding that the NRC staff had not complied with NEPA, and repeating the "irreparable injury" requirement).

The agency's decision in this case and its apparent practice are contrary to NEPA. The statute's requirement that a detailed environmental impact statement be made for a "proposed" action makes clear that agencies must take the required hard look *before* taking that action. *See, e.g.*, *Pub. Emps. for Envtl. Responsibility v. Hopper*, 827 F.3d 1077, 1081 (D.C. Cir. 2016) (holding that an agency's decision to issue a lease for a windpower project "without first obtaining sufficient site-specific data . . . violated" NEPA (internal quotation marks omitted)); *New York*, 681 F.3d at 476 ("Under NEPA, each federal agency must prepare an [EIS] before taking a 'major Federal action[] significantly affecting the quality of the human environment.'" (quoting 42 U.S.C. § 4332(2)(C))).[9] Nothing in

---

[9] *See also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989) ("NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct."); *Robertson*, 490 U.S. at 349 (explaining that NEPA "focus[es] the agency's attention on the environmental consequences of a *proposed*

NEPA's text suggests that the required environmental analysis of a "proposed" action is optional if a party does not prove that "irreparable harm" would result from going forward before the agency completes a valid EIS.

The nontextual exception upon which the NRC insists would vitiate the statute's "'action-forcing' purpose." *Robertson*, 490 U.S. at 349. As the Court explained in *Robertson*:

> The statutory requirement that a federal agency *contemplating* a major action prepare such an environmental impact statement serves NEPA's "action-forcing" purpose in two important respects. . . . It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*id.* (emphasis added); *see Baltimore Gas & Electric Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983). If an agency fails to complete the required review before authorizing a proposed project -- whether or not a party is able to present evidence of

---

project" (emphasis added)); *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015) (explaining that NEPA requires agencies to take a "hard look" at environmental consequences of proposed actions "in advance of deciding whether and how to proceed"); 40 C.F.R. § 1500.1(b) (Council on Environmental Quality regulation providing that "NEPA procedures must [e]nsure that environmental information is available to public officials and citizens before decisions are made and before actions are taken").

harm at that stage -- it runs the risk "that important effects will . . . be overlooked or underestimated only to be discovered after . . . the die [has been] cast." *Robertson*, 490 U.S. at 349; *see Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 23 (2008); *Ill. Commerce Comm'n v. ICC*, 848 F.2d 1246, 1259 (D.C. Cir. 1988).

Indeed, the nature of the agency action in this case puts the problem in high relief. As we have noted, the Tribe "has shown it has the most direct historical, cultural, and religious ties to the [Dewey-Burdock project] area." ASLB Initial Decision, 81 N.R.C. at 656 (J.A. 455). A significant number of cultural, historical, and archaeological sites have already been identified in the project area, including burial sites. EIS, NUREG-1910 at 4-159 to -182 (J.A. 655-78). The Tribe is concerned that mining, as well as the construction and other land disturbances that precede mining, will damage those resources. *See* Trina Lone Hill Decl. ¶¶ 5, 28. The purpose of an EIS is, in part, to determine whether the land contains such resources and where they are located, so that damage to them can be avoided or mitigated. If the project is permitted to go forward without the necessary land survey, such damage may well be done.

In short, the NRC has placed the Tribe in a classic Catch-22. It must show irreparable harm to insist that an adequate survey be completed. But it likely cannot show even the risk of such harm unless that survey is completed. Of course, if the project goes forward and the burial or other sites are damaged, the Tribe will then be able to show irreparable harm -- but by then, it will be too late to stop it.

The NRC's conduct in this case may be compared -- unfavorably -- to that of the Interstate Commerce Commission in *Illinois Commerce Commission v. ICC*, 848 F.2d 1246. There, the court declined to remand the agency's policy of

publishing an environmental assessment after publishing notice of proposed abandonment of a railroad line. But it did so only because the agency represented that, if environmental issues were raised, a stay would "automatically be granted until the concerns are resolved by the [agency]," with "no showing of irreparable harm or probability of success . . . required." *Id.* at 1260. That procedure, we said, "obviate[d] the possibility that an abandonment would be authorized even though environmental questions were still outstanding." *Id.* Needless to say, that procedure -- providing for an automatic stay without the need to show irreparable harm -- stands in stark contrast to the approach the Commission employed here. And for the reasons we have stated, the latter is contrary to law.

B

In this subpart, we address the NRC's defense of its ruling.

1. The justification upon which the Commission relied in its order was an analogy to this court's treatment of "harmless error" when reviewing an agency decision. NRC Order, 84 N.R.C. at 245 (J.A. 268) ("[F]ederal courts have required that parties demonstrate harm or prejudice to disturb an agency's decision."). The analogy is inapt.

The "harmless error" doctrine that this court applies is compelled by a statute, the Administrative Procedure Act, which provides that "due account shall be taken of the rule of prejudicial error," 5 U.S.C. § 706; *see, e.g.*, *First Am. Discount Corp. v. Commodity Futures Trading Comm'n*, 222 F.3d 1008, 1015 (D.C. Cir. 2000). As the Commission itself notes, however, "the Board and Commission are not courts, and so 5 U.S.C. § 706 does not govern their choices of remedy" for Staff errors. NRC Br. 34. Nor does NEPA -- or any other statute that has been called to our attention -- give the NRC authority to

forgive "harmless" violations of NEPA. *Cf.* 38 U.S.C. § 7261(b)(2) (directing the United States Court of Appeals for Veterans Claims to "take due account of the rule of prejudicial error"); 28 U.S.C. § 2111 (instructing appellate courts to give judgment "without regard to errors or defects which do not affect the substantial rights of the parties").

But whether or not that ends the argument -- a question we do not need to decide -- what the agency has done here looks nothing like the harmless error review undertaken by this court.

First, it is true that "[w]e have applied the prejudicial error rule in the NEPA context where the proposing agency engaged in significant environmental analysis before reaching a decision but failed to comply *precisely* with NEPA procedures." *Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006) (emphasis added); *see, e.g.*, *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 217 (D.C. Cir. 2013) (holding that any "technical error" in the timing of the release of an environmental assessment was harmless when the agency completed the assessment "before authorizing any" operations). But the error here was neither a failure of precision nor a technicality. Rather, as the Board itself said, it was a "significant deficiency" in the Staff's NEPA review. ASLB Initial Decision, 81 N.R.C. at 658 (J.A. 457).[10]

---

[10] This circuit has also sometimes regarded deviations from NEPA as harmless when an agency subsequently completed a comprehensive environmental review before the matter reached our court. *See Nat. Res. Def. Council*, 879 F.3d at 1211-12 (refusing to remand where the agency "adequately augmented its decision before being challenged in th[e] court"); *Friends of the River*, 720 F.2d at 106-08 (declining to remand when the agency completed a thorough, if belated, environmental review). In this case, however, the agency has not yet completed a valid review.

The Commission's order disparaged this error as merely "procedural." NRC Order, 84 N.R.C. at 245 (J.A. 268); *see* NRC Br. 34, 35. But "NEPA imposes only procedural requirements." *Winter*, 555 U.S. at 23. If even "significant" deficiencies in NEPA reviews are forgiven because they are merely procedural, there will be nothing left to the protections that Congress intended the Act to provide. Moreover, in a comparable situation, "[w]e have not been hospitable to government claims of harmless error in cases in which the government violated [the procedural requirement of APA] § 553 . . . by failing to provide notice" of proposed agency action. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014).

Given the significant deficiency at issue in this case, the harmless error doctrine cannot justify the agency's ruling. As we have noted, the Board found that the EIS "does not contain an analysis of the impacts of the project on the cultural, historical, and religious sites of the Oglala Sioux Tribe and the majority of the other consulting Native American tribes." ASLB Initial Decision, 81 N.R.C. at 655 (J.A. 454). As a consequence, "the EIS does not include mitigation measures sufficient to protect this Native American tribe's cultural, historical, and religious sites that may be affected by the Powertech project." *Id.* That assessment of the risks to the Tribe's sites is consistent with the Commission's generic EIS for these kinds of mining projects: "[D]epending on local conditions," the agency has explained, ISL facility construction can cause a "large" impact on "ecological, historical, or cultural resources" because of the "potential for unidentified resources to be altered or destroyed during excavation, drilling, and grading." Generic EIS for In-Situ Leach Uranium Milling Facilities, NUREG-1910 at xlii (May 2009) (J.A. 531).

In this context, the agency may not properly conclude that its failure to comply with NEPA is harmless simply because the Tribe cannot point to specific historical sites that are at risk. Indeed, placing the burden on the Tribe to show harm was especially inappropriate because the inadequate EIS may well make doing so impossible. *See Winter*, 555 U.S. at 23 ("[W]ithout [an EIS], there may be little if any information about prospective environmental harms and potential mitigating measures."); *cf. Pub. Emps. for Envtl. Responsibility*, 827 F.3d at 1082 (refusing to "excuse the [agency] from its NEPA obligation to gather data about the seafloor" before issuing a lease for a wind turbine project because "[w]ithout adequate geological surveys, the [agency] cannot ensure that the seafloor [will be] able to support wind turbines" (internal quotation marks omitted)).

Second, the point at issue here is not simply forgiveness of a single error. As we have explained, it appears to be the NRC's settled practice to keep licenses in effect, notwithstanding significant NEPA deficiencies, unless an intervenor shows irreparable harm. *See supra* Part III.A. That does not represent the application of a harmless error exception to a statutory violation. It represents a wholesale rewrite of NEPA.

Third, the standard of review the Commission approved is not just a "harmless" error standard -- it is an "irreparable harm" standard. *See supra* note 8. The harmless error standard of the APA merely requires a showing of prejudice. That standard does not "impose a . . . particularly onerous requirement." *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009); *see Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010) ("If prejudice is obvious to the court, the party challenging agency action need not demonstrate anything further.").

The irreparable harm standard applied by the Board, in contrast, derives from the standard courts must apply in granting injunctive relief. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010); *Winter*, 555 U.S. at 20, 22. It is not the standard for the "less drastic" APA remedy of vacatur, *see Monsanto*, 561 U.S. at 165-66, nor is it the standard applied under the APA's harmless error provision, *see Shinseki*, 556 U.S. at 410. Rather, it requires a substantially higher showing. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-98 (D.C. Cir. 2006). Here, it requires a well-nigh impossible one. How, after all, can the Tribe show that Powertech's project will irreparably damage its cultural artifacts if there has not been a survey adequate to determine where those artifacts are located?

2. NRC counsel -- but not the Commission itself -- also analogize the Commission's treatment of the erroneous Staff decision to the analysis this court applies when considering whether to vacate or merely remand erroneous agency actions. NRC Br. 34-39. As counsel correctly note, "[t]his Court has long held when considering remedies under § 706 that the 'decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Id.* at 34 (quoting, inter alia, *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)); *see Allina Health Servs.*, 746 F.3d at 1110-11.

Because the NRC order appealed here does not rely upon this reasoning, *see* NRC Order, 84 N.R.C. at 245 (J.A. 268), neither can we. *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."); *see NLRB. v. CNN Am., Inc.*, 865 F.3d 740, 751 (D.C. Cir. 2017). In any event, this argument-by-analogy

has flaws that are similar to those of the Commission's harmless error argument.

As is true of this court's "harmless error" analysis, our remand practice is informed by the APA. *Compare* 5 U.S.C. § 706(2)(A) ("[T]he reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . not in accordance with law . . . ."), *with id.* § 702 ("Nothing herein . . . affects . . . the power or duty of the court to . . . deny relief on any other appropriate . . . equitable ground . . . ."). But once again, the agency fails to identify any statute that authorizes it not to comply with NEPA on equitable grounds.

Without resolving whether the absence of statutory authority is sufficient to reject the analogy to judicial remand-without-vacatur, what the agency has done here does not mirror the court's decisionmaking process in that regard.

As the above quotation from *Allied-Signal* indicates, in deciding whether vacatur is required, we first consider the "seriousness of the order's deficiencies." 988 F.2d at 150. Here, the NRC acknowledged a "significant deficiency in the NRC Staff's NEPA review." ASLB Initial Decision, 81 N.R.C. at 658 (J.A. 457). It nonetheless left the license in place, in part because it regarded the failure to comply with NEPA as merely a "procedural deficienc[y]." NRC Br. 34; *see id.* at 37. But as we have just underlined, NEPA is a purely procedural statute and taking such an approach would vitiate it. Nor is it true, as counsel claim, that this court routinely remands (without vacatur) violations of procedural requirements. *See* NRC Br. 37. To the contrary, in the comparable circumstance of the APA's procedural requirements, we have held that "deficient notice is a 'fundamental flaw' that almost always requires vacatur." *Allina Health Servs.*, 746 F.3d at 1110 (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009)).

The seriousness of the NEPA deficiency is particularly clear here because the point of NEPA is to require an adequate EIS before a project goes forward, so that construction does not begin without knowledge of the affected cultural and historical sites. "Part of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about *prospective* environmental harms and potential mitigating measures." *Winter*, 555 U.S. at 23 (emphasis added). As the ASLB acknowledged, "[b]ecause the cultural, historical, and religious sites of the Oglala Sioux Tribe have not been adequately catalogued, the [EIS] does not include mitigation measures sufficient to protect this Native American tribe's cultural, historical, and religious sites that may be affected by the Powertech project." ASLB Initial Decision, 81 N.R.C. at 655 (J.A. 454). Indeed, even when we have remanded without vacatur, we have considered this kind of concern and conditioned the remand accordingly. *Cf. Pub. Emps. for Envtl. Responsibility*, 827 F.3d at 1084 (declining to vacate a windpower project owner's lease for a deficient EIS, but vacating the agency's impact statement and requiring it "to supplement [the impact statement] with adequate geological surveys before [the project] may begin construction"). The Commission did not do that here.[11]

---

[11] NRC counsel maintain that the Board "determined that vacating the license would not prevent potential harm to the Tribe's cultural resources." NRC Br. 35. The Board did conclude, more than two years *before* the order at issue here, that a stay would be of only "limited and incomplete effect." ASLB Stay Denial Order, No. 40-9075-MLA at 7-8 (J.A. 517-18). But that 2014 order was based on an assessment of ground-disturbing work expected only "for the next few months," *id.* at 7 (J.A. 517), and there is no reason to believe its reasoning remained relevant to the status of construction in 2016. Indeed, that explanation was not repeated in either the Board's 2015 decision or the 2016 Commission order that upheld the 2015 decision and is now under review. We are therefore unable to evaluate its

As *Allied-Signal* further indicates, we also evaluate the "disruptive consequences of an interim change." *Allied-Signal*, 988 F.2d at 150-51 (internal quotation marks omitted). But here, neither the Commission's nor the Board's order examined what the consequences would be for Powertech were its license vacated or suspended until the NRC completed its NEPA review. *See* NRC Order, 84 N.R.C. at 245 (J.A. 268); ASLB Initial Decision, 81 N.R.C. at 657-58 (J.A. 456-57). Nor did those orders examine the potential consequences for the Tribe.[12]

Finally, once again the issue here is not just what to do about a single agency error, but what to do about the validity of an NRC practice that permits NEPA-deficient licenses to remain in place unless an intervenor can show irreparable harm. We have never turned merely to a remand remedy when an agency refused to adhere to a statutory command in such an across-the-board fashion.

---

validity, which reaffirms the wisdom of adhering to *Chenery*'s rule that the soundness of an agency's decision must rest on the reasoning contained therein, and not on any post hoc justifications offered by counsel. *Chenery Corp.*, 318 U.S. at 87-88; *see NLRB v. CNN Am., Inc.*, 865 F.3d at 751.

[12] The NRC brief posits that "the Commission reasonably left the license in place -- thereby ensuring NRC's continued ability to enforce the cultural-resource protections the license already imposes on Powertech -- while allowing the agency to address the procedural deficiencies identified by the Board." NRC Br. 35 (citing, by analogy, *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 188 (D.C. Cir. 2017)). The order makes no mention of this consideration, and we are unable to evaluate its validity. The Tribe -- which has the most direct interest in cultural resources protection and yet calls for vacatur of the license -- obviously feels that the site is better protected without the license than with whatever limited protections it may impose. This again shows the wisdom of adhering to *Chenery*'s rule.

3. NRC counsel make two further arguments that are also not reflected in the Commission's order. Even if they were meritorious, *Chenery* would render them insufficient to uphold the order.

First, NRC counsel maintain that the ASLB's decision to leave the license in place was justified because it was "based in part on the Tribe's own actions making the NHPA consultation process unnecessarily difficult." NRC Br. 35. But the Commission's order did not rely on this justification and instead noted that "the Board acknowledged that it could not definitively determine whether the Staff or the Tribe bore responsibility for what the Board considered a breakdown in consultation." NRC Order, 84 N.R.C. at 244 (J.A. 266-67).

Second, counsel argue that the agency's "adjudicatory hearing process, which led to the identification of deficiencies in NRC's compliance with NEPA . . . , did not arise from th[at] statute[], but, rather, from the Atomic Energy Act." NRC Br. 38. Whether the Commission could have delegated to its Staff the final authority to resolve NEPA issues without appeal to the Commission is a question that we need not answer today. The fact is that the Commission did not do so, and thus must explain why it permitted the project to go forward despite its own determination that the Staff had failed to comply with NEPA. As we have explained, the Commission has failed to offer a justification that is consistent with its statutory responsibility.

C

To be clear, today we hold only that, once the NRC determines there is a significant deficiency in its NEPA compliance, it may not permit a project to continue in a manner that puts at risk the values NEPA protects simply because no intervenor can show irreparable harm. We do not decide that the

Commission may never leave in place a license that its Staff previously issued but that the Commission later finds NEPA-deficient.  That is, we do not decide that there is no version of a harmless error rule that the Commission may apply.  Nor do we decide that there are no protective conditions the Commission might impose that would justify leaving a license in place during an administrative remand intended to cure a NEPA deficiency.  *Cf. Pub. Utils. Comm'n v. FERC*, 900 F.2d 269, 282 (D.C. Cir. 1990) (holding that NEPA did not preclude FERC from issuing an approval that was "expressly not to be effective until [an] environmental hearing was completed").

Regardless of whether one of those options might pass muster, the Commission did not follow such a course here.

IV

Because the standard that the Commission applied in permitting Powertech's license to remain in effect is inconsistent with NEPA, we remand this matter to the agency for further consideration consistent with this opinion.  We do not, however, vacate the agency's ruling.  As we recounted above, an appellate court's decision regarding whether to vacate or merely remand "depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed."  *Allied-Signal*, 988 F.2d at 150-51 (internal quotation marks omitted).

We have no doubt about the seriousness of the order's deficiencies.  But we have not been given any reason to expect that the agency will be unable to correct those deficiencies, and we are concerned about the disruptive consequences of vacating the license while the agency proceeds to satisfy NEPA.  Powertech reasonably relied on the NRC's ruling and settled

practice that permitted the continued effectiveness of the license the Staff issued. And it has represented to the court that its stock price "would plummet" if the license were "suspended, vacated, or revoked." Oral Arg. Tr. 30.

More important, it appears that the Tribe will not suffer harm -- irreparable or otherwise -- from a disposition that leaves the license in effect *for now*. Powertech has further represented that a South Dakota permitting requirement independently bars it from moving forward with construction on the site until the NRC completes its compliance with NEPA. Oral Arg. Tr. 32-35. We note that the Tribe doubts this representation. *Id.* at 37. But for now, we rely on it. If the representation turns out not to be correct, the Tribe will have grounds to seek further redress from this court. *Cf. Pub. Empls. for Env. Responsibility*, 827 F.3d at 1084 (requiring the agency "to supplement [the impact statement] with adequate geological surveys before [the project] may begin construction").

V

The Nuclear Regulatory Commission's December 2016 order is not entirely final, and as a consequence we do not have jurisdiction over the bulk of the rulings challenged by the Oglala Sioux Tribe. Under the collateral order doctrine, however, we do have jurisdiction to review the Commission's decision to leave Powertech's license in place -- notwithstanding the NRC's acknowledgment that it has not yet complied with the National Environmental Policy Act -- on the ground that the Tribe failed to show irreparable harm. Because that decision is contrary to law, we grant the petition for review in part and remand the case to the Commission for further proceedings consistent with this opinion.

*So ordered.*